### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

| | |
|---|---|
| STEVEN L. WEISSMAN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **Civil Action No.** |
| Plaintiff, | ) ) |
| v. | ) CLASS ACTION COMPLAINT ) |
| THE ST. JOE COMPANY, WILLIAM BRITTON GREENE, WILLIAM S. MCCALMONT, PETER S. RUMMELL and JANNA L. CONNOLLY, | ) ) ) ) **JURY TRIAL DEMANDED** |
| Defendants. | ) ) |

Plaintiff, Steven L. Weissmann ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his Class Action Complaint against Defendants, The St. Joe Company, William Britton Greene, William S. McCalmont, Peter S. Rummell and Janna L. Connolly (collectively, "Defendants"), alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things: a review of Defendants' public documents; conference calls and announcements made by Defendants; Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Defendant, The St. Joe Company ("St. Joe" or the "Company"); securities analysts' reports and advisories about the Company; and information readily obtainable on the Internet. Plaintiff incorporates by reference the October 13, 2010 presentation about St. Joe by David Einhorn ("Einhorn") entitled "Field of Schemes: If You Build It, They Won't Come." Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all persons or entities who purchased or otherwise purchased the securities of St. Joe, including purchasers and sellers of options during the period from February 19, 2008 through and including October 12, 2010 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  This class action is brought under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      St. Joe is one of the largest real estate development companies in Florida and is engaged in town and resort development, commercial and industrial development and rural land sales. The Company operates in four segments: Residential Real Estate, Commercial Real Estate, Rural Land Sales and Forestry.  As of December 31, 2009, St. Joe owned approximately 577,000 acres of land concentrated primarily in northwest Florida, as well as approximately 405,000 acres on the coast of the Gulf of Mexico. St. Joe's 2009 Annual Report valued the Company's real estate holdings at $749,500,000.

3.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) as the Florida real estate market was in decline, St. Joe was failing to take adequate and required impairments and accounting write-downs on many of its Florida-based property developments; (2) as a result, St. Joe's financial statements materially overvalued the Company's Florida-based property developments; (3) the Company's financial

statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (4) the Company lacked adequate internal and financial controls; and (5) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

4.      On October 13, 2010, Einhorn of Greenlight Capital Inc. detailed the need of the Company to take "substantial impairments" and accounting writedowns on many of its properties, and that further building by the Company would drive the stock price to zero. Einhorn's presentation noted that St. Joe's "development plans have fallen flat, leaving it with 'ghost towns' and inevitable writedowns."  For example, Einhorn said he would "generously" place a value of $17.8 million on the remaining residential development at St. Joe's Windmark Beach property while the Company is carrying the property at $164.5 million on its balance sheet.  Einhorn also stated that the Company "was 'stuck' after making an aggressive bet on beachfront developments that have gone nowhere, and that it was overvaluing the real estate holdings on its books."

5.      On this news, shares of the Company's stock declined $2.38 per share, or 9.7%, on October 13, 2010.  The next trading day, the Company's shares declined an additional $2.42 per share, or 10.9%, to close at $19.74 per share. Cumulatively over these two days, St. Joe's shares declined a total of $4.80 per share, or over 19.5%.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, St. Joe's principal executive offices are located within this District.

10.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

**Plaintiff**

11.     Plaintiff, Steven L. Weissmann, as set forth in the accompanying certification incorporated by reference herein, purchased St. Joe securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**Defendants**

12.     Defendant, St. Joe, is a Florida corporation with its principal executive offices located at 133 South WaterSound Parkway, WaterSound, Florida.  The Company is a real estate operating company that provides community, commercial, industrial, leisure, and resort development, as well as timber, and commercial real estate services.  The aggregate number of shares of St. Joe securities outstanding as of October 28, 2010 is approximately 92.6 million.  St. Joe is actively traded on the NYSE under the ticker symbol "JOE."

13.     Defendant, William Britton Greene ("Greene"), was, at all relevant times, the Company's President.  Since May 13, 2008, Defendant Greene has served as the Company's Chief Executive Officer ("CEO") and a member of the Company's Board of Directors ("Board").

14.     Defendant, William S. McCalmont ("McCalmont"), was, at all relevant times, the Company's Chief Financial Officer ("CFO") and an Executive Vice President.

15.     Defendant, Peter S. Rummell ("Rummell"), was, at all relevant times, the Company's CEO until May 13, 2008 and Chairman of the Board until August 2008.

16.     Defendant, Janna L. Connolly, ("Connolly") was, at all relevant times, the Company's Chief Accounting Officer.

17.     The Defendants referenced above in ¶¶ 13-16 are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

18.     St. Joe is a real estate development company and is one of the largest such companies in Florida.  The Company operates in four segments: Residential Real Estate, Commercial Real Estate, Rural Land Sales and Forestry.  The Residential Real Estate segment

develops mixed-use resort, and seasonal and primary residential communities. This segment also focuses on selling undeveloped land to third-party developers or investors. The Commercial Real Estate segment develops and sells real estate primarily for commercial and light industrial uses. The Rural Land Sales segment markets parcels for rural recreational, conservation, and timberland uses. The Forestry segment grows, harvests and sells timber and wood fiber, and provides land management services for conservation properties.

**Defendants' False and Misleading Statements**

19.    On February 19, 2008, the Company issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2007. For the fourth quarter 2007, the Company reported a net income of $1 million or $0.01 per share, compared to a net income of $22.3 million or $0.30 per share for the same period last year. For the full year 2007, the Company reported a net income of $39.2 million or $0.53 per share, compared to a net income of $51 million or $0.69 per share for the same period last year. Full year results were affected by pre-tax impairment charges of $23.2 million or $0.19 per share after tax, which included approximately $13.6 million primarily related to a write-down of costs on homes and home sites in the Company's residential segment to approximate fair value. The Company also reported that the Company's investment in real estate was $943.5 million.

20.    On February 25, 2008, the Company filed an annual report on Form 10-K for the year ended December 31, 2007 with the SEC, which was signed by, among others, Rummell, Greene, McCalmont, and Connolly. The Form 10-K confirmed the Company's 2007 financial results, financial position, and the reported value of the Company's investments in real estate. In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the Form 10-K contained signed certifications by Rummell and McCalmont, stating that the financial information contained in the

10-K was accurate, and that they had disclosed any material changes to the Company's internal control over financial reporting.

21.     As to the Company's asset impairment costs, the Company's Form 10-K stated, in relevant part, the following:

> During 2007, we recorded total asset impairment costs of $23.2 million, $13.0 million of which related to the write down of capitalized costs at certain projects due to changes in development plans and the impairment of completed homes in several of our communities due to current market conditions. If market conditions were to continue to deteriorate, and the market values for our home sites, remaining homes held in inventory and other project land were to fall below the book value of these assets, we would need to take additional write-downs of the book value of these assets. Any such write-downs would decrease the value of these assets on our balance sheet and would reduce our net income.
>
> ***
>
> *Impairment Losses.*   We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and home-sites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing service potential of the project and using management's best estimates about future sales prices and holding periods. The decline in demand and market prices for residential real estate caused us to conclude that carrying amounts within our residential real estate segment may not be recoverable, and we performed an impairment analysis. As a result of our impairment analyses, we recorded an impairment charge of $13.6 million in the residential real estate segment.
>
> ***
>
> *Impairment of Long-lived Assets and Goodwill.*   Our long-lived assets, primarily real estate held for investment, are carried at cost unless circumstances indicate that the carrying value of the assets may not be recoverable. If we determine that an impairment exists due to the inability to recover an asset's carrying value, a provision for loss is recorded to the extent that the carrying value exceeded estimated fair value. If such assets were held for sale, the provision for loss would be recorded to the extent that the carrying value exceeds estimated fair value less costs to sell.
>
> Depending on the asset, we use varying methods to determine fair value, such as (i) analyzing expected future cash flows, (ii) determining resale values by market, or (iii) applying a capitalization rate to net operating

income using prevailing rates in a given market. The fair value determined under these methods can fluctuate up or down significantly as a result of a number of factors, including changes in the general economy of our markets, demand for real estate and the projected net operating income for a specific property.

***

**Asset Impairments**

The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and home-sites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing service potential of the project and using management's best estimates about future sales prices and holding periods. The overall decrease in demand and market prices for residential real estate indicated that carrying amounts of certain assets within its residential real estate segment may not be recoverable and, accordingly, the Company recorded an impairment charge of $13.6 million in the residential real estate segment during 2007.

22.    On May 6, 2008, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2008.  The Company reported a net income of $32.1 million, or $0.40 per share, compared to a net income of $19.7 million, or $0.27 per share, for the same period last year.  The Company also reported that the Company's investment in real estate was $950.7 million.

23.    On May 6, 2008, the Company filed a quarterly report on Form 10-Q for the first quarter ended March 31, 2008 with the SEC, which was signed by Rummell and Connolly, and confirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Rummell and McCalmont, stating that the financial information contained in the 10-Q was accurate, and that they had disclosed any material changes to the Company's internal control over financial reporting.

24.     The Company's Form10-Q represented the following, in relevant part, concerning its asset impairments:

> The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and home-sites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing service potential of the project and using management's best estimates about future sales prices and holding periods. The continued decrease in demand and market prices for residential real estate during the first quarter of 2008 indicated that certain carrying amounts within our residential real estate segment may not be recoverable. As a result of the first quarter 2008 impairment analysis, the Company has recorded an impairment charge of $2.3 million in the residential real estate segment.

25.     On August 5, 2008, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2008.  The Company reported a net loss of $20.8 million or $0.23 per share for the quarter, compared to a net income of $25.3 million, or $0.34 per share, in the same period of the prior year.  The Company also reported that its investment in real estate was $947.6 million.

26.     On August 5, 2008, the Company filed a quarterly report on Form 10-Q for the second quarter ended June 30, 2008 with the SEC, which was signed by Greene and Connolly. The Form 10-Q confirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Greene and McCalmont, stating that the financial information contained in the 10-Q was accurate, and that they had disclosed any material changes to the Company's internal control over financial reporting.

27.     The Company's Form10-Q represented the following in relevant part concerning its asset impairments:

The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and home-sites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing service potential of the project and using management's best estimates about future sales prices and holding periods. The continued decrease in demand and market prices for residential real estate during the first six months of 2008 indicated that certain carrying amounts within the Company's residential real estate segment may not be recoverable. In addition, for the second quarter 2008 the Company recorded an impairment charge of $0.8 million related to the write down of a renegotiated builder note receivable. As a result of its impairment analyses, the Company has recorded aggregate impairment charges of $3.2 million in the residential real estate segment for the first six months of 2008 of which $2.2 million was recognized in the first quarter and $1.0 million in the second quarter.

28.     On November 4, 2008, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2008.  The Company reported a net loss of $19.2 million or $0.21 per share for the quarter, compared to a net loss of $6.8 million, or $0.09 per share in the same period of the prior year.  The Company also reported that the Company's investment in real estate was $930.4 million.

29.     On November 4, 2008, the Company filed a quarterly report on Form 10-Q for the third quarter ended September 30, 2008 with the SEC, which was signed by Greene and Connolly.  The Form 10-Q confirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Greene and McCalmont, stating that the financial information contained in the 10-Q was accurate, and that they had disclosed any material changes to the Company's internal control over financial reporting.

30.     The Company's Form 10-Q represented the following, in relevant part, concerning its asset impairments:

10

The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and home-sites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing project and using management's best estimates about future sales prices and holding periods. The continued decrease in demand and market prices for residential real estate during the first nine months of 2008 and 2007 indicated that certain carrying amounts within the Company's residential real estate segment may not be recoverable. In addition, during the second quarter 2008 the Company recorded an impairment charge of $0.8 million related to the write down of a renegotiated builder note receivable. As a result of its 2008 impairment analyses, the Company has recorded aggregate impairment charges of $1.3 million and $4.6 million in the residential real estate segment for the three and nine months ended September 30, 2008. The Company also recorded an impairment charge of $13.0 million in the third quarter of 2007.

31.     On February 24, 2009, the Company issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2008.  The Company reported a net loss of $27.9 million or $0.31 per share for the quarter, compared to a net income of $1 million, or $0.01 per share in the same period of the prior year.  For the full year, the Company reported a net loss of $35.9 million or $0.40 per share, compared to a net income of $39.2 million, or $0.53 per share for the full year 2007.  The Company also reported that its investment in real estate was $890.6 million.

32.     On February 24, 2009, the Company filed an annual report on Form 10-K for the year ended December 31, 2008 with the SEC, which was signed by, among others, Greene, McCalmont and Connolly.  The Form 10-K confirmed the Company's 2008 financial results, financial position, and the reported value of the Company's investment in real estate.  In addition, pursuant to SOX, the Form 10-K contained signed certifications by Greene and McCalmont, stating that the financial information contained in the 10-K was accurate, and that

they had disclosed any material changes to the Company's internal control over financial reporting.

33.    The Form 10-K represented the following concerning the Company's asset impairment costs:

> *If the market values of our homesites, our remaining inventory of completed homes and other developed real estate assets were to drop below the book value of those properties, we would be required to write-down the book value of those properties, which would have an adverse affect on our balance sheet and our earnings.*
>
> Unlike most other real estate developers, we have owned the majority of our land for many years, having acquired most of our land in the 1930's and 1940's. Consequently, we have a very low cost basis in the majority of our lands. *In certain instances, however, we have acquired properties at market values for project development.* Also, many of our projects have expensive amenities, such as pools, golf courses and clubs, or feature elaborate commercial areas requiring significant capital expenditures. *Many of these costs are capitalized as part of the book value of the project land. Adverse market conditions, in certain circumstances, may require the book value of real estate assets to be decreased, often referred to as a "write-down" or "impairment." A write-down of an asset would decrease the value of the asset on our balance sheet* and would reduce our earnings for the period in which the write-down is recorded.
>
> *During 2008, we recorded total asset impairment costs of $60.5 million, $41.3 million of which primarily related to the write-down of capitalized costs at certain projects and the impairment of completed homes in several of our communities due to current market conditions. If market conditions were to continue to deteriorate, and the market values for our homesites, remaining homes held in inventory and other project land were to fall below the book value of these assets, we could be required to take additional write-downs of the book value of those assets.*
>
> ***
>
> *Impairment of Long-lived Assets and Goodwill.* Our long-lived assets, primarily real estate held for investment, are carried at cost unless circumstances indicate that the carrying value of the assets may not be recoverable. If we determine that an impairment exists due to the inability to recover an asset's carrying value, a provision for loss is recorded to the extent that the carrying value exceeds estimated fair value. If such assets were held for sale, the provision for loss would be recorded to the

extent that the carrying value exceeds estimated fair value less costs to sell.

Depending on the asset, we use varying methods to determine fair value, such as (i) analyzing expected future cash flows, (ii) determining resale values by market, or (iii) applying a capitalization rate to net operating income using prevailing rates in a given market. The fair value determined under these methods can fluctuate up or down significantly as a result of a number of factors, including changes in the general economy of our markets, demand for real estate and the projected net operating income for a specific property.

\*\*\*

We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods. The continued decline in demand and market prices for residential real estate during 2008 caused us to evaluate certain carrying amounts within our residential real estate segment. *As a result of our property impairment analyses, we recorded aggregate impairment charges in our residential real estate segment of $40.3 million during 2008.* In addition, we recorded a charge of $1.0 million related to the write down of a renegotiated builder note receivable during 2008.

\*\*\*

## Asset Impairments

The Company reviews its long-lived assets other than goodwill, for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing service potential of the project and using management's best estimates about future sales prices and holding periods. The continued decrease in demand and market prices for residential real estate indicated that carrying amounts of certain assets within its residential real estate segment may not be recoverable.

*As a result of the Company's property impairment analyses for 2008, it recorded aggregate impairment charges of $41.3 million* consisting of $12.0 million related to completed homes in several

communities, $28.3 million related to the Company's SevenShores condominium project and $1.0 million related to the write down of a renegotiated builder note receivable.

The Seven Shores condominium project was written down in the fourth quarter of 2008 to approximate the fair market value of land entitled for 278 condominium units. This write-down was necessary because the Company elected not to exercise its option to acquire additional land under its option agreement. Certain costs had previously been incurred with the expectation that the project would include 686 units. Given the reduced potential scope of the project, the Company does not believe that those costs are recoverable.

***In 2007 the Company recorded impairments totaling $13.6 million due to the adverse market conditions for residential real estate.*** Approximately $5.2 million of the impairments related to capitalized costs at certain projects due to changes in development plans, approximately $7.8 million related primarily to the reduction in market value of completed homes in several communities, and approximately $0.6 million related to the modified terms of certain promissory notes. No impairment charges were recorded in 2006.

The Company reviews its long-lived assets other than goodwill, for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing service potential of the project and using management's best estimates about future sales prices and holding periods. The continued decrease in demand and market prices for residential real estate indicated that carrying amounts of certain assets within its residential real estate segment may not be recoverable. [Emphasis added.]

34.     On May 5, 2009, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2009.  The Company reported a net loss of $11.7 million or $0.13 per share for the quarter, compared to a net income of $32.1 million, or $0.40 per share in the same period of the prior year.  The Company also reported that the Company's investment in real estate was $888.1 million.

35.     On May 5, 2009, the Company filed a quarterly report on Form 10-Q for the first quarter ended March 31, 2009 with the SEC, which was signed by Greene and Connolly.  The

Form 10-Q confirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Greene and McCalmont, stating that the financial information contained in the 10-Q was accurate, and that they had disclosed any material changes to the Company's internal control over financial reporting.

36.     The Company's Form 10-Q represented the following, in relevant part, concerning its asset impairments:

> The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods. In the first quarter of 2009 and 2008, the Company recorded impairment charges in the residential real estate segment of $0.2 million and $2.3 million, respectively, related to completed unsold homes. In addition as discussed in Note 3, the Company recorded a $1.3 million impairment charge in the first quarter of 2009 related to a renegotiated builder note receivable.

37.     On August 4, 2009, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2009.  The Company reported a net loss of $44.6 million or $0.49 per share for the quarter, compared to a net loss of $20.8 million, or $0.23 per share in the same period of the prior year.  The Company also reported that its investment in real estate was $869.8 million.

38.     On August 4, 2009, the Company filed a quarterly report on Form 10-Q for the second quarter ended June 30, 2009 with the SEC, which was signed by Greene and Connolly. The Form 10-Q confirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.  In addition, pursuant to SOX, the

Form 10-Q contained signed certifications by Greene and McCalmont, stating that the financial information contained in the 10-Q was accurate, and that they had disclosed any material changes to the Company's internal control over financial reporting.

39.     The Company's Form 10-Q represented the following, in relevant part, concerning its asset impairments:

> *Impairment Losses.* We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods. During the second quarter of 2009 we recorded impairment charges of $12.1 million in the residential real estate segment related to completed unsold homes and homesites and a write-down of our SevenShores condominium and marina development project. During the second quarter of 2008 we recorded impairment charges of $0.2 million related to completed unsold homes. In addition, we recorded a $7.4 million write-off of the Advantis note receivable and a $0.4 million write-down of a builder note receivable during the second quarter of 2009 and a $0.8 million write-down of a builder note receivable during the second quarter of 2008.
>
> During the first six months of 2009 we recorded impairment charges of $12.4 million in the residential real estate segment related to completed unsold homes and home sites and a write-down of our SevenShores condominium and marina development project. During the first six months of 2008 we recorded impairment charges of $ 2.4 million related to completed unsold homes. In addition, we recorded a $7.4 million write-off of the Advantis note receivable and a $1.7 million write-down of builder notes receivable during the first six months of 2009 and a $0.8 million write-down of a builder note receivable during 2008.

40.     On November 3, 2009, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2009.  The Company reported a net loss of $14.4 million or $0.16 per share for the quarter, compared to a net loss of $19.2 million,

or $0.21 per share in the same period of the prior year.   The Company also reported that its investment in real estate was $844.9 million.

41.      On November 3, 2009, the Company filed a quarterly report on Form 10-Q for the third quarter ended September 30, 2009 with the SEC, which was signed by Greene and Connolly.   The Form 10-Q confirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.   In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Greene and McCalmont, stating that the financial information contained in the 10-Q was accurate, and that they disclosed any material changes to the Company's internal control over financial reporting.

42.      The Company's Form 10-Q represented the following, in relevant part, concerning its asset impairments:

> *Impairment Losses.* We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods.
>
> During the third quarter of 2009:
>
> - We recorded a $9.0 million write-down related to the settlement of the Saussy Burbank notes receivable, a $0.1 million write-down of builder notes receivable and a $1.1 million impairment charge related to other long-term assets; and
>
> - We recorded a $0.9 million write-down related to completed unsold homes and homesites within other communities.
>
> During the third quarter of 2008 we recorded impairment charges of $1.3 million related to completed unsold homes.
>
> During the first nine months of 2009:
>
> - We recorded a $6.5 million impairment charge related to completed unsold homes and homesites in our communities and a $6.7 million write-down of our SevenShores condominium and

marina development project; and

- We recorded a $9.0 million write-down related to the settlement of the Saussy Burbank notes receivable, a $7.4 million write-off of the Advantis note receivable, a $1.9 million write-down of builder notes receivable and a $1.1 million impairment charge related to other long-term assets.

During the first nine months of 2008 we recorded impairment charges of $3.8 million related to completed unsold homes and a $0.8 million write-down of a builder note receivable.

43.    On February 23, 2010, the Company issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2009.  The Company reported a net loss of $59.3 million or $0.65 per share for the quarter, compared to a net loss of $27.9 million, or $0.31 per share in the same period of the prior year.  For the full year, the Company reported a net loss of $130 million or $1.42 per share, compared to a net loss of $35.9 million or $0.40 per share for the full year 2007.  The Company also reported that its investment in real estate was $749.5 million.

44.    On February 23, 2010, the Company filed an annual report on Form 10-K for the year ended December 31, 2009 with the SEC, which was signed by, among others, Greene, McCalmont and Connolly.  The Form 10-K confirmed the Company's 2009 financial results, financial position, and the reported value of the Company's investment in real estate.   In addition, pursuant to SOX, the Form 10-K contained signed certifications by Greene and McCalmont, stating that the financial information contained in the 10-K was accurate, and that they had disclosed any material changes to the Company's internal control over financial reporting.

45.    The Form 10-K represented the following concerning the Company's asset impairment costs:

*If the market values of our homesites, our remaining inventory of completed homes and other developed real estate assets were to drop below the book value of those properties, we would be required to write-down the book value of those properties, which would have an adverse affect on our balance sheet and our earnings.*

Unlike most other real estate developers, we have owned the majority of our land for many years, having acquired most of our land in the 1930's and 1940's. Consequently, we have a very low cost basis in the majority of our lands. In certain instances, however, we have acquired properties at market values for project development. Also, many of our projects have expensive amenities, such as pools, golf courses and clubs, or feature elaborate commercial areas requiring significant capital expenditures. Many of these costs are capitalized as part of the book value of the project land. Adverse market conditions, in certain circumstances, may require the book value of real estate assets to be decreased, often referred to as a "write-down" or "impairment." A write-down of an asset would decrease the value of the asset on our balance sheet and would reduce our earnings for the period in which the write-down is recorded.

If market conditions were to continue to deteriorate, and the market values for our homesites, remaining homes held in inventory and other project land were to fall below the book value of these assets, we could be required to take additional write-downs of the book value of those assets.

***

**Long-Lived Assets and Discontinued Operations**

The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain the existing project and using management's best estimates about future sales prices and holding periods.

***

Investment in Real Estate:

We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and using

19

management's best estimates about future sales prices and holding periods. ***The continued decline in demand and market prices for residential real estate during 2007 through 2009 caused us to reevaluate certain carrying amounts within our residential real estate segment, which resulted in the recording of significant impairment charges.*** [Emphasis added.]

46.     On May 4, 2010, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2010.  The Company reported a net loss of $11.4 million or $0.13 per share for the quarter, compared to a net loss of $12 million, or $0.13 per share in the same period of the prior year.  The Company also reported that its investment in real estate was $747.3 million.

47.     On May 4, 2010, the Company filed a quarterly report on Form 10-Q for the first quarter ended March 31, 2010 with the SEC, which was signed by Greene and Connolly.  The Form 10-Q confirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Defendants Greene and McCalmont, stating that the financial information contained in the 10-Q was accurate, and that they had disclosed any material changes to the Company's internal control over financial reporting.

48.     The Company's Form 10-Q represented the following, in relevant part, concerning its asset impairments:

The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell. The fair value of homes and homesites is determined based upon final sales prices of inventory sold during the period (level 2 inputs). For inventory held for sale, estimates of selling prices based on current market data are utilized (level 3 inputs). For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods

(level 3 inputs). ***In the first quarter of 2010 and 2009, the Company recorded impairment charges in the residential real estate segment of $0.1 million and $0.2 million, respectively.***

\*\*\*

*Impairment Losses.* We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods. ***During the first quarter 2010 and 2009 we recorded impairment charges of $0.1 million and $0.2 million, respectively in the residential real estate segment.*** In addition, we recorded a $1.3 million write down of a renegotiated builder note receivable in our residential real estate segment during the first quarter of 2009. [Emphasis added.]

49.    On August 5, 2010, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2010.  The Company reported a net loss of $8.6 million or $0.09 per share for the quarter, compared to a net loss of $44 million, or $0.49 per share in the same period of the prior year.  The Company also reported that its investment in real estate was $748.2 million.

50.    On August 5, 2010, the Company filed a quarterly report on Form 10-Q for the second quarter ended June 30, 2010 with the SEC, which was signed by Greene and Connolly. The Form 10-Q confirmed the Company's quarterly financial results, financial position, and the reported value of the Company's investment in real estate.  In addition, pursuant to SOX, the Form 10-Q contained signed certifications by Greene and McCalmont, stating that the financial information contained in the 10-Q was accurate, and that they had disclosed any material changes to the Company's internal control over financial reporting.

51.    The Company's Form 10-Q represented the following, in relevant part, concerning its asset impairments:

The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at lower of carrying value or fair value less costs to sell. The fair value of homes and homesites is determined based upon final sales prices of inventory sold during the period (level 2 inputs). For inventory held for sale, estimates of selling prices based on current market data are utilized (level 3 inputs). For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods (level 3 inputs). The Company's assets measured at fair value on a nonrecurring basis are those assets for which the Company has recorded valuation adjustments and write-offs during the current period. For the six months ending June 30, 2010, the valuation adjustments and write-offs were $0.1 million. ... ***Long-lived assets sold or held for sale with a carrying amount of $41.5 million were written down to their fair value of $29.2 million, resulting in a loss of $12.4 million, which was included in impairment losses for the six months ending June 30, 2009.***

***

*Impairment Losses.* We review our long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Homes and homesites substantially completed and ready for sale are measured at the lower of carrying value or fair value less costs to sell. For projects under development, an estimate of future cash flows on an undiscounted basis is performed using estimated future expenditures necessary to maintain and complete the existing project and using management's best estimates about future sales prices and holding periods. ***During the second quarter of 2010 and the first six months of 2010, we recorded impairment charges on homes and homesites of zero and $0.1 million, respectively, in the residential real estate segment.*** During the second quarter of 2010 we also recorded a $0.5 million write-down resulting from a renegotiated builder note receivable in the residential segment.

***During the second quarter of 2009 we recorded impairment charges of $12.2 million in the residential real estate segment related to completed unsold homes and homesites*** and a write-down of a condominium and marina development project which was sold in the third quarter of 2009. In addition, we recorded a $7.4 million write-off of the Advantis note receivable and a $0.4 million write-down of a builder note receivable.

***During the first six months of 2009 we recorded impairment charges of $12.4 million in the residential real estate segment related to completed unsold homes and homesites*** and a write-down of a

condominium and marina development project. In addition, we recorded a $7.4 million write-off of the Advantis note receivable and a $1.7 million write-down of builder notes receivable.

52.     The statements referenced above in ¶¶ 19-51 above were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them that: (1) as the Florida real estate market was in decline, St. Joe was failing to take adequate and required impairments and accounting write-downs on many of its Florida based property developments; (2) as a result, the Company's financial results materially overvalued the Company's Florida based property developments; (3) the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls; and (5) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

53.     On October 13, 2010, Einhorn gave a presentation entitled "Field of Schemes: If You Build It; They Won't Come," where he argued that the Company's real estate should be valued far less than the Company's current value of $746 million.  Einhorn noted how St. Joe needed to take "substantial impairments" and accounting writedowns on many of its properties, and that further development by the Company would drive the stock price to zero.  Einhorn stated that he believed that St. Joe's "development plans have fallen flat, leaving it with 'ghost towns' and inevitable writedowns."  Einhorn further said he would "generously" place a value of $17.8 million on the remaining residential development at St. Joe's Windmark Beach property while the Company is carrying the property at $164.5 million on its balance sheet.  Einhorn also stated how the Company "was 'stuck' after making an aggressive bet on beachfront developments that have gone nowhere, and that it was overvaluing the real estate holdings on its

books," and that "[t]here's little evidence of how Joe spent so much money on these developments. Many developments are ghost towns and little value remains." Additionally, Einhorn stated that "[w]ith the popping of the bubble, Joe's business has practically stopped," as he showed a 139-page slide show of the Company's real estate holdings, including footage and film of St. Joe's developments.

54.     During that day, *Bloomberg* published an article entitled "Einhorn Says St. Joe Needs 'Substantial' Writedowns," where it discussed Einhorn's presentation.   The article recounted in relevant part:

> "The best properties have been sold, many lots were sold to speculators during the boom, and when the boom ended, business essentially stopped," Einhorn, who runs hedge-fund operator Greenlight Capital Inc., said today at the Value Investing Congress in New York. "There's little evidence of how Joe spent so much money on these developments. Many developments are ghost towns and little value remains."
>
> ***
>
> The company is accounting for untouched land as developed, Einhorn said. Also, St. Joe's RiverTown community is a "moonscape," and WaterSound is empty, he said.
>
> "Joe's highest and best use is to return to a rural land company," he said. "Management should sell the company, but it can't because the stock price is too high."

55.     On this news, St. Joe's stock fell $2.38 per share, or nearly 10%, to close at $22.16 per share on October 13, 2010.  The stock plummeted an additional $2.42 per share, or nearly 11%, to close at $18.74 per share on October 14, 2010.  Cumulatively within the two trading sessions, St Joe's stock declined $4.80, or more than 19.5%.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf a Class of all persons who purchased or acquired St. Joe securities, including purchasers and sellers of options during the Class Period (the "Class").

Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

57.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, St. Joe securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by St. Joe or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

58.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

59.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

60.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of St. Joe;

- whether the Individual Defendants caused St. Joe to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of St. Joe securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

61.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

62.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- St. Joe securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold St. Joe securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

63.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## CLAIMS FOR RELIEF

### COUNT I

**(Against All Defendants For Violations of
Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

66.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of St. Joe securities; and (iii) cause Plaintiff and other members of the Class to purchase St. Joe securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

67.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for St. Joe securities and options.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about St. Joe's finances and business prospects.

68.    By virtue of their positions at St. Joe, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

69.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of St. Joe securities from their personal portfolios.

70.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of St. Joe, the Individual Defendants had knowledge of the details of St. Joe's internal affairs.

71.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

St. Joe.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to St. Joe's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of St. Joe securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning St. Joe's business and financial condition, which were concealed by defendants, Plaintiff and the other members of the Class purchased St. Joe securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by defendants and were damaged thereby.

72.     During the Class Period, St. Joe securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of St. Joe securities and options at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said shares and options, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true value of St. Joe securities and options were substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of St. Joe securities and options declined sharply upon public disclosure of the facts alleged herein, to the injury of Plaintiff and Class members.

73.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

75.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

76.     (a)     During the Class Period, the Individual Defendants participated in the operation and management of St. Joe, and conducted and participated, directly and indirectly, in the conduct of St. Joe's business affairs.  Because of their senior positions, they knew the adverse non-public information about St. Joe's misstatement of income and expenses and false financial statements.

(b)     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to St. Joe's financial condition and results of operations, and to promptly correct any public statements issued by St. Joe which had become materially false or misleading.

(c)     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which St. Joe disseminated in the marketplace during the Class Period concerning St. Joe's results of operations.   Throughout the Class Period, the Individual

Defendants exercised their power and authority to cause St. Joe to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of St. Joe within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of St. Joe securities and options.

77.     Each of the Individual Defendants, therefore, acted as a controlling person of St. Joe.  By reason of their senior management positions and/or being directors of St. Joe, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause St. Joe to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of St. Joe and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

78.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by St. Joe.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D.      Awarding rescissionary damages; and

E.      Awarding such equitable, injunctive or other relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury of all issues that may be so tried.

Dated:  December 7, 2010

Respectfully Submitted,

By:   _s/ Scott R. Shepherd_____
**SHEPHERD FINKELMAN**
  **MILLER & SHAH LLP**
Scott R. Shepherd
Florida Bar No. 069655
sshepherd@sfmslaw.com
Nathan C. Zipperian
Florida Bar No. 065125
nzipperian@sfmslaw.com
Jayne A. Goldstein
Florida Bar No. 0144088
jgoldstein@sfmslaw.com
1640 Town Center Circle
Suite 216
Weston FL 33326
(954) 515-0123 telephone
(954) 515-0124 facsimile

**POMERANTZ HAUDEK
  GROSSMAN & GROSS LLP**
Marc I. Gross
migross@pomlaw.com
Jeremy A. Lieberman
jalieberman@pomlaw.com
Fei-Lu Qian
flqian@pomlaw.com
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: 212-661-1100
Facsimile:  212-661-8665

**POMERANTZ HAUDEK
  GROSSMAN & GROSS LLP**
Patrick V. Dahlstrom
pdahlstrom@pomlaw.com
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Phone: 312-377-1181
Fax: 312-377-1184

*Counsel for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, _Steven L Weissman_ , make this declaration pursuant to Section 21D(a)(2) of the Securities Exchange Act of 1934.

2.  I have reviewed a Complaint against The St. Joe Company ("St. Joe"), and authorize a filing of a comparable complaint on my behalf.

3.  I did not purchase St. Joe securities at the direction of plaintiff's counsel or in order to participate in any private action arising under the U.S federal securities laws.

4.  I am willing to serve as a representative party on behalf of a Class as set forth in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in St. Joe securities during the Class Period as specified in the Complaint.

6.  During the three-year period proceeding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws, except as following:

*In re China North East Petroleum Sec. Litig.,* 10-cv-4775 (S.D.N.Y)

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty or perjury that the foregoing is true and correct.

Executed __12/6/10__ , at __Flushing Ny__
            (Date)              (City, State)

__Steven L Weissman__
(Signature)

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 5/04/10 | Purchase | 200 | $30.58 |
| 9/17/10 | Option Exercise Purchase | 300 | $20.00 |
| 11/4/10 | Sales | 500 | $19.96 |
| 3/16/10 | Purchase | 3 calls | $8.30 |
| 9/20/10 | Sale | 5 calls | $.75 |
| 11/4/10 | Purchase | 5 calls | $.05 |
| 5/4/10 | Sell | 2 calls | $3.30 |
| 3/16/10 | sell | 4 puts | $3.90 |
| 10/14/10 | Purchase | 4 puts | $1.10 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |